# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1844V

| | |
|---|---|
| FAYTH BRENNAN,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: October 28, 2024 |

*Rhonda Lorenz-Pignato*, Shannon Law Group, PC, Woodridge, IL, *for Petitioner*.

*Mark Kim Hellie*, U.S. Department of Justice, Washington, DC, *for Respondent*.

## **DECISION AWARDING DAMAGES**[1]

On December 14, 2020, Fayth Brennan filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from a tetanus diphtheria ("Td") vaccine received on November 7, 2019. Petition at 1.

The case was assigned to the Special Processing Unit of the Office of Special Masters. Although I ruled in September 2023 that Petitioner was entitled to compensation (ECF No. 36), the parties were unable to resolve damages. Accordingly, the question of damages has been briefed by both sides. Now, for the reasons set forth below, I find that

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Petitioner is entitled to a damages award of **$40,000.00 for actual pain and suffering, plus $2,364.49 for out of pocket expenses.**

## I. Relevant Facts[3]

### A. Medical Records

On November 7, 2019, Petitioner received a Td vaccine in her right deltoid. Ex. 2 at 1. Three months later, on February 11, 2020, she saw John Brennan, Doctor of Chiropractic Medicine, at the Brennan Chiropractic Clinic, complaining of pain in her right deltoid from the November vaccination.[4] Ex. 3 at 9. Dr. Brennan is Petitioner's husband and primary care physician, and Petitioner also works part time at his office, serving as the office manager and performing physical therapy. Ex. 1 at ¶¶ 2, 3, 5.

Petitioner stated at this time that she had been experiencing right deltoid pain and shoulder soreness since vaccination. Ex. 3 at 13. She reported a pain level of zero to one at rest, but ten out of ten when she moved her arm "wrong," which caused a deep ache that lasted three to five seconds. *Id*. She had self-treated until this time, thinking it would go away. *Id*.

On examination, Petitioner displayed decreased and painful range of motion ("ROM") in all directions, depending on her hand and thumb position. Ex. 3 at 9, 12. Her right shoulder active and passive ROM was 180 degrees in abduction, with pain beyond 120 degrees, 45 degrees in internal rotation, 90 degrees in external rotation, 150 degrees in flexion, and 45 degrees in extension.[5] *Id*. at 12. She had positive results on the Yergason's and Appley's tests. *Id*. Dr. Brennan recommended hot packs and trigger point therapy. *Id*. at 9.

Petitioner returned to Dr. Brennan over two months later, on April 30, 2020, rating her right arm pain as the same as before, with ongoing decreased ROM. Ex. 3 at 9. Dr. Brennan recommended stretches and trigger point therapy. *Id*. Petitioner also received chiropractic adjustments for her neck, mid-back, and low back. *Id*. She sought care again the following week (May 5, 2020), reporting very mild improvement to no change, with continuing decreased ROM. *Id*. at 9. She rated her pain as nine out of ten. *Id*. Dr. Brennan again recommended stretches and trigger point therapy. *Id*.

---

[3] Although I have reviewed the entire record, this decision discusses only the evidence relevant to the parties' dispute.

[4] Dr. Brennan's records are handwritten and difficult to read.

[5] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 90 to 100 degrees in external rotation, 70 to 90 degrees in internal rotation, and 50 to 60 degrees in extension. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 76, 80, 84, 88 (F. A. Davis Co., 5th ed. 2016).

2

Petitioner saw Dr. Brennan for the same issues on May 12, May 19, and May 26, 2020, reporting pain ranging from zero to ten out of ten. Ex. 3 at 10. On June 9, 2020, Dr. Brennan noted that Petitioner's ROM had improved, but external rotation was still painful. Ex. 3 at 11. Her pain continued to range from zero to ten in June 2020. *Id.* at 11, 14.

On June 16, 2020, Petitioner underwent a right shoulder MRI. Ex. 4 at 1-2. The MRI showed a small articular sided tear of the supraspinatus and no evidence of soft tissue abnormality adjacent to the pain marker along the lateral deltoid. *Id.* at 2. There was a small area of fluid collection within the articular side of the anterior supraspinatus tendon. *Id.* at 1. There was no evidence of subacromial-subdeltoid bursal effusion. *Id.*

Petitioner continued to treat with Dr. Brennan that summer. By July 7, 2020, she had no pain with ROM, and continued to complain of pain between zero and ten out of ten. Ex. 3 at 14. However, on July 20, 2020, Petitioner was seen for the first time by a third party treater - orthopedist Dr. Daniel Buss of Sports & Orthopaedic Specialists. Ex. 5 at 17. She now reported right shoulder pain that began after her November 2019 vaccination. *Id.* at 18. Her symptoms had continued despite self-treatment, including band exercises, and chiropractic visits with her husband since February, which included manipulation and soft tissue mobilization. *Id.* The pain was emanating from the anterior and lateral aspect of the shoulder, and was worse with reaching back, reaching across her body, and various rotational movements. *Id.* She had occasional nighttime pain. *Id.* The record states that she rated her pain as zero out of ten. *Id.*

On examination, Petitioner's right shoulder active ROM was 175 degrees in forward flexion and abduction (compared to 180 degrees on the left) and 70 degrees in external rotation (compared to 85 degrees on the left). Ex. 5 at 18. Dr. Buss reviewed the MRI and noted a thickened inferior capsule, degenerative rotator cuff findings, a partial supraspinatus defect, atrophy of the supraspinatus, moderate acromioclavicular hypertrophy, and congenital type 3 acromion. *Id.* He advised that "her diagnosis of adhesive capsulitis can take up to 18 months to resolve." *Id.* at 19. He recommended conservative treatment including physical therapy and a possible glenohumeral joint injection, which Petitioner declined. *Id.*

Petitioner underwent a physical therapy evaluation on July 28, 2020. Ex. 5 at 2. She presented with decreased ROM, which she reported began after a painful vaccination to the right lateral shoulder. *Id.* at 3.[6] On examination, her right shoulder ROM was reduced and painful. *Id.* at 4. Her right shoulder active ROM was 135 degrees in flexion, 105 degrees in abduction, and 65 degrees in external rotation. *Id.* at 4. She had positive right shoulder impingement results on the Neer and Hawkins Kennedy tests as well as internal impingement and crossover impingement tests. *Id.* at 5. While additional sessions

---

[6] The record states that Petitioner presented with decreased ROM of her *left* shoulder (Ex. 5 at 3), but the examination section records reduced and painful ROM of her *right* shoulder (Ex. 5 at 4). Thus, the reference to Petitioner's left shoulder appears to be a typo.

3

were recommended, Petitioner explained that she is a physical therapy assistant and her husband is a chiropractor and she planned to do exercises on her own with her husband's help, with no further formal physical therapy planned. *Id.* at 6. Petitioner was given a home exercise program. *Id.* Petitioner filed documents from Courage Kenny Sports & Physical Therapy Center (where she received physical therapy) and Sports & Orthopaedic Specialists (her orthopedist's practice), containing twelve pages of shoulder exercises. Ex. 6.

Petitioner continued to see her husband for her shoulder pain through July and August 2020. Ex. 3 at 15-16. Her ROM showed some improvement and she continued to report pain levels between zero and ten out of ten. *Id.*

Petitioner saw Dr. Brennan three times in September 2020, reporting decreased frequency and intensity of her shoulder pain as well as improved ROM. Ex. 3 Vol. II (ECF No. 48-2) at 19.[7] On September 15, 2020, she noted pain with certain motions, mostly abduction, and that when pain was present it was nine out of ten and lasted about five seconds. *Id.* On October 20, 2020, she was still experiencing lingering pain and had plateaued. *Id.* at 18. She returned to Dr. Brennan on November 3, December 1, and December 15, 2020. *Id.* at 17-18. At all of these appointments, she also received chiropractic adjustments to her neck, mid-back, and low back areas. *Id.* at 17-19. At her December 15, 2020 appointment, she was experiencing pain with certain motions, and was able to do more activities without pain. Ex. 3 Vol. III (ECF No. 13-2) at 32. When present, the pain was nine out of ten. *Id.*

Petitioner continued treating with Dr. Brennan into early 2021, seeing him on January 7, January 19, and February 9, 2021. Ex. 3 Vol. III (ECF No. 13-2) at 32-33. The January 7th record noted intense pain at end point ROM, which was most pronounced in internal rotation. *Id.* at 32. Dr. Brennan added that she "should cont[inue] to [treat] every 2-3 [weeks] while she cont[inues] with P.T. at home exercises." *Id.* At her February 9th appointment, her pain had decreased in frequency, but she rated it as ten out of ten when it occurred. *Id.* at 33. There is a record dated March 2 or 7, 2021 that is crossed off with a note "No time to finish appt." *Id.* at 33. She saw Dr. Brennan on March 9, March 23,

---

[7] Petitioner's filings in this case are not organized or labeled properly. Petitioner filed Exhibit 3, containing records from Brennan Chiropractic, with the petition on December 14, 2020 (ECF No. 1-5). On July 1, 2021, she filed Exhibit 3 Volume III (ECF No. 13-2), which was mislabeled as Exhibit 3 Volume *II* (although the CM/ECF docket text correctly noted it as Exhibit 3 Volume III). Over the next three years, she filed additional Brennan Chiropractic records as Exhibits 14, 16, and 17 (ECF Nos. 30-2, 38-2, and 43-2). Then, after damages briefing was nearly complete, she filed additional Brennan Chiropractic records, this time labeling them Exhibit 3 Volume II (ECF No. 48-2), and continuing the pagination from Exhibit 3 that was filed over three years earlier. While records sometimes may be split into multiple volumes if necessary for uploading to CM/ECF, it is not expected or appropriate to file records months or years later purporting to supplement an earlier exhibit. Doing so makes the record confusing and difficult to follow. The records filed as Exhibit 3 Volumes II and III should have simply been given a new exhibit number. The same is true of two other records filed on March 7, 2024, Exhibit 4 Vol. II (ECF No. 48-3) and Exhibit 5 Vol. II (ECF No. 48-4).

4

April 6, April 20, May 11, June 1, and June 22, 2021. *Id.* at 33-35. She received chiropractic adjustments to her neck and back, in addition to her shoulder, at most of these appointments. *Id.*

Petitioner continued treating with Dr. Brennan for the next two years, sometimes on a regular basis and at times with gaps of one to four months. Exs. 3, 14, 16, 17. At many of these visits, she received chiropractic care for her neck and back as well as her shoulder. *Id.* By January 2022, she had regained full ROM. Ex. 14 at 4. She continued to have pain with pressure at the injection site, but her pain ratings were generally low. Exs. 3, 14, 16, 17. On May 10, 2022, Dr. Brennan noted that Petitioner had regained approximately 90% of her right shoulder ROM, but still had pain with palpation at the injection site. Ex. 16 at 1. He thought this was likely a permanent condition. *Id.* Petitioner received chiropractic adjustments to her neck and mid-back areas at this visit. *Id.*

Petitioner saw Dr. Brennan on June 7, 2022, complaining that her right shoulder recently started aching at the injection site. Ex. 16 at 2. She rated her pain as two to three out of ten. *Id.* She wanted to use conservative care and avoid injections and surgery. *Id.* She also received chiropractic care to her mid-back area. *Id.* The next month (July 12, 2022), her right shoulder ROM was still good, but the muscles around her right shoulder were sore and painful with palpation. *Id.* She received chiropractic adjustments to her neck and mid-back areas as well as her shoulder. *Id.* She returned to Dr. Brennan on September 13 and December 13, 2022 for right shoulder pain. *Id.* at 3. At both appointments she received chiropractic adjustments to her neck, mid-back, and low back areas. *Id.*

On January 24, 2023, Petitioner reported to Dr. Brennan that her right arm was "much better." Ex. 16 at 4. Two months later (March 14, 2023), she explained that her right arm pain had gone away, but recently reappeared. *Id.* She received chiropractic adjustments to her neck area as well. *Id.* She continued to treat with Dr. Brennan at two to four month intervals, on May 30, August 8, and December 5, 2023, also receiving chiropractic adjustments to her neck, mid-back, and low back areas. *Id.* at 5; Ex. 17 at 1.

### B. Testimonial Statements

Petitioner has filed an affidavit and four declarations in support of her claim.[8] Exs. 1, 11, 12, 13, 19. Petitioner has a degree as a physical therapy assistant. Ex. 1 at ¶ 3. She is generally in good health and tries to manage her health on her own, having only seen a medical doctor approximately three times in the 19 years prior to her vaccination.

---

[8] Although Petitioner labeled Exhibits 11, 12, 13, and 19 as affidavits, they are not notarized. Nonetheless, they are acceptable as declarations because they comply with the requirements of 28 U.S.C. §1746.

*Id.* at ¶ 4. She grew up on a farm and learned to allow injuries to heal at home rather than going to a doctor. Ex. 11 at ¶¶ 2-3. She continued these natural practices as an adult, and has minimal health insurance coverage and has had "very little medical treatment as an adult." *Id.* at ¶ 3. She tries to manage her health using her knowledge and training from working as a physical therapy assistant and 28 years working in a chiropractic office. Ex. 1 at ¶ 4.

When she received the November 7, 2019 Td vaccine, Petitioner found it to be "more painful than any shot I had ever received before," and she recalled yelling "[ow] that hurt!" when it was administered. Ex. 1 at ¶ 7. Afterward, she experienced additional pain within 48 hours at or around the injection site in her right deltoid, as well as limited ROM. *Id.* at ¶ 10. She attempted to manage the pain on her own using hot packs, trigger point therapy, stretches, trans friction massages, and homeopathic remedies. *Id.* at ¶ 11. Approximately a month after vaccination, she contacted the Wright County Public Health Department (where she was vaccinated) about her shoulder pain, and was informed that the Td shot was one of the more painful shots. *Id.* at ¶ 12. Thus, she decided to continue self-treating. *Id.*

Petitioner did research online and found that beyond physical therapy, the only treatment options were medication and surgery, which she did not want to pursue. Ex. 1 at ¶ 13. During this time, she got sick, her mother got sick, and her children came home for the holidays. *Id.* at ¶¶ 14-16. She continued to self-treat in the early days of the COVID-19 Pandemic. *Id.* at ¶ 19. In late April 2020, she returned to Brennan Chiropractic for treatment. *Id.* at ¶ 20. At best, her pain was zero to one out of ten, but when she moved her arm in certain ways she experienced an intense, deep ache for three to five seconds that she rated as ten out of ten. *Id.*

Petitioner continued weekly treatments between May and July 2020, also continuing physical therapy exercises at home during this time. Ex. 1 at ¶¶ 21, 23, 26. When she saw Dr. Buss in July 2020, he told her she had adhesive capsulitis, which generally resolved without surgery but could take up to 18 months to resolve. *Id.* at ¶ 24. She had one formal physical therapy evaluation, then performed the exercises on her own, due to her education and experience. *Id.* at ¶ 25.

Petitioner experienced marked improvements from her treatment, and as of January 2022 (when she signed the declaration filed as Exhibit 11), she had full ROM and no pain with ROM of her shoulder. Ex. 11 at ¶ 7. However, she still had pain with pressure at the injection site, as well as unusual fatigue with prolonged use of her right arm. *Id.* She describes the pain as a "sharp bee sting like sensation at times, as well as a deep, aching pain." *Id.*

Petitioner's vaccine injury "greatly affected" her home life for over a year. Ex. 11 at ¶ 8. She had difficulty with daily activities like hugging her children, putting on and taking off clothes, reaching into the back seat, and was not able to play basketball or pickleball.

*Id.* In October,[9] "at the direction of Brennan Chiropractic and myself," she began taking a natural product to help her body detox from heavy metals and toxins. Ex. 11 at ¶ 9.

Dr. Brennan also submitted an affidavit on Petitioner's behalf. Ex. 12. He stated that as Petitioner's primary treating doctor and husband, he has seen Petitioner try to manage her health using natural methods and that except for a few rare occasions, she generally does not seek treatment from medical doctors. *Id.* at ¶¶ 4, 6-7. He saw Petitioner on a daily basis since her vaccination with the exception of short trips or visits to their children. *Id.* at ¶ 8.

On November 7, 2019, Petitioner told Dr. Brennan that she received a Td vaccine and that her right shoulder and arm were in pain thereafter. Ex. 12 at ¶ 11. Over the following month, she continued to complain that her right arm was still hurting a lot from the vaccination. *Id.* at ¶ 12. She performed stretches but continued to have sharp pain in her right shoulder with various motions, along with pain and tenderness at the injection site. *Id.* at ¶¶ 12-13. Petitioner was busy during the months following vaccination due to the holidays, their children coming home on break, and caring for her mother and herself when they became ill. *Id.* at ¶ 14.

Dr. Brennan began treating Petitioner's right shoulder pain on February 11, 2020. Ex. 12 at ¶ 15. His treatments have included manual adjustments, massage, trigger point therapy, trans friction massage, hot packs, electrical muscle stimulation, Pettibone Tendon Ligament Muscle Stimulator, and ultrasound. *Id.* at ¶ 16. Since her injury, he has noticed Petitioner favoring her right arm and at times discontinuing activities due to shoulder pain. *Id.* at ¶ 19. She was able to regain normal ROM in her shoulder and arm, but (as of January 20, 2022, when the declaration filed as Exhibit 12 was signed), continued to have pain and tenderness with pressure at the vaccination situs. *Id.* at ¶ 20. Her shoulder pain limited many activities for over a year. *Id.* at ¶ 21. He also noticed that her endurance has suffered, and that she has decreased outdoor activities due to her injury. *Id.* at ¶ 21.

Levi Brennan submitted an affidavit in support of Petitioner, his mother. Ex. 13. He explained that he was away at college when she received the vaccine, but returned home for breaks around November 23-26, 2019 and December 20, 2019 to January 12, 2020. *Id.* at ¶¶ 5-6. During those breaks, he saw his mother struggle to reach at or above her head due to pain and resistance from her right arm. *Id.* at ¶ 6. When he was in the kitchen, he helped by getting items off of shelves for her. *Id.* She struggled to put on her coat or give him a hug due to her limited ROM. *Id.*

Levi Brennan and Petitioner traveled together in early March 2020. Ex. 13 at ¶ 7. During that trip, he did not see her struggle with her arm because he was mostly with

---

[9] Petitioner does not state the year. In any event, Petitioner has agreed to subtract the "nutrient charges." Reply at *7.

friends and when he did see her, she was not participating in activities that aggravated her arm. *Id.* He does recall that she struggled changing clothes at night and in the morning. *Id.* In late March, he moved back home and continued to see her show pain and restrictions from her right shoulder. *Id.* at ¶ 8.

Over the next year, Levi Brennan saw his mother struggle with limitations such as difficulty reaching overhead, putting on her jacket, and putting her arm around him for a hug, and she could not play racket sports or basketball. Ex. 13 at ¶ 9. He often heard her exclaim "Ow, ow, ow, ow!" when she moved her arm in a certain position. *Id.* at ¶ 10. He states this happened "multiple times a week, and sometimes daily, for over a year." *Id.* He recalls seeing her attempt to hit a pickleball in late May 2020 and that she "ended up doubling over in pain." *Id.* at ¶ 11.

As of late January 2022 (when he signed the declaration filed as Exhibit 13), Levi Brennan states that it does not appear that she has any remaining ROM problems. Ex. 13 at ¶ 12. However, she still complained of pain at the vaccination situs. *Id.*

Dr. Brennan filed a supplemental declaration concerning the Brennan Chiropractic billing and records. Ex. 19. He explains that charges for adjustments to Petitioner's shoulder were coded on bill as "CMT-extra spinal." *Id.* at ¶ 5. Charges for adjustments to "referred neck and mid-back pain" were described on bills as "CMT, spinal 1-2 regions." *Id.* at ¶ 6.

Dr. Brennan explains that referred pain occurs when a body part is injured and other body parts feel the effects of it. Ex. 19 at ¶ 8. He asserts that Petitioner's neck and mid-back were affected by her shoulder injury. *Id.* As such, he asserts that the "CMT, spinal 1-2 regions" adjustments were "medically necessary to help bring healing and were related to her shoulder injury." *Id.* at ¶ 9. And the fact that Petitioner regained full ROM without residual shoulder pain "should show what I did as her chiropractor was effective." *Id.* at ¶ 10. He adds that ultrasound uses sound waves to produce vibrations, which create heat that penetrates deep within tissues and helps relax muscles, increase blood flow, speed healing, break adhesions and scar tissue, and reduce inflammation, and this therapy helped Petitioner's shoulder heal. *Id.* at ¶ 11.

### C. Other Evidence

Petitioner submitted an out of pocket summary and billing detail document. Ex. 18. Petitioner requests reimbursement of $4,000.00 for services from Brennan Chiropractic, $50.00 for orthopedic services provided by Allina Health, $189.49 for physical therapy services provided by Allina Health, and $600.00 paid to Summa for an MRI. *Id.* at 1. Petitioner included proof of payment for these expenses. Ex. 4 Vol II (ECF No. 48-3) at 13; Ex. 18 at 11-14. For expenses paid to Brennan Chiropractic, Petitioner included a

cancelled check dated December 5, 2023 in the amount of $4,000.00 that was drawn on the account of "J and F Brennan." Ex. 18 at 11.

The Brennan Chiropractic records include a charge for service on May 24, 2022. Ex. 18 at 8. However, there does not appear to be a treatment record for that date.

## II.   The Parties' Arguments

### A. Pain and Suffering

Petitioner requests an award of $80,000.00 for pain and suffering. Petitioner's Damages Brief, filed Jan. 17, 2024, at *19 (ECF No. 45) ("Br."). Petitioner asserts that she treated for over three years, including 15 months of severe pain, followed by 17 months of mid to lower pain, and another 15 months of low sporadic pain (Br. at *13-18). She had an MRI, an orthopedic evaluation, a physical therapy evaluation, and 48 chiropractic sessions, and performed exercises on her own. *Id.* at *13. She also notes that her visits to and treatment by a chiropractor are "similar to that of a physical therapist."[10] *Id.* (citing *Wolford v. Sec'y of Health & Human Servs.*, No. 17-451V, 2022 WL 3133468 (Fed. Cl. Spec. Mstr. July 11, 2022). Petitioner cites *Wolford*, *Gibson*, *Mantagas*, *Russano*, and *Coluccio*, with pain and suffering awards ranging from $70,000.00 to $80,000.00, in support of her proposed award.[11]

Respondent, by contrast, does not propose a specific pain and suffering award, instead asserting that Petitioner's overall injury was "very mild" and suggesting an "award consistent with awards in other cases of that nature." Respondent's Damages Brief, filed Feb. 27, 2024, at *6 (ECF No. 47) ("Opp."). Respondent states that he routinely proffers less than $37,500.00 in cases "when it is clear that damages are worth less than in the lowest reasoned pain-and-suffering awards," citing decisions in *McKenna*, *McGraw*,[12] and

---

[10] Petitioner misreads *Wolford,* however. The records in that case repeatedly referred to the petitioner receiving physical therapy treatment from a chiropractor. *See Wolford*, 2022 WL 3133468, at *11 ("petitioner visited a chiropractor for physical therapy"); *id.* at *3 (noting that the treating chiropractor gave the petitioner shoulder exercises and stretches to do); *id.* at *4-5 (Petitioner's primary care physician noted the petitioner was seeing a chiropractor for physical therapy and advised him to continue, and the orthopedist advised him to continue physical therapy). It was in that context that the special master stated that the petitioner's "treatment by a chiropractor is similar to that of a physical therapist." *Id.* at *11. In this case, the records indicate that Petitioner received *chiropractic* care – not physical therapy – from Dr. Brennan.

[11] *Wolford*, 2022 WL 3133468; *Gibson v. Sec'y of Health & Human Servs.*, No. 20-243V, 2022 WL 17820891 (Fed. Cl. Spec. Mstr. Oct. 5, 2022); *Mantagas v. Sec'y of Health & Human Servs.*, No. 20-1720V, 2023 WL 4573855 (Fed. Cl. Spec. Mstr. June 14, 2023); *Russano v. Sec'y of Health & Human Servs.*, No. 18-0392V, 2020 WL 3639804 (Fed. Cl. Spec. Mstr. June 4, 2020); and *Coluccio v. Sec'y of Health & Human Servs.*, No. 19-1684V, 2022 WL 17849579 (Fed. Cl. Spec. Mstr. Nov. 14, 2022).

[12] As Petitioner notes in her reply, at the time of briefing *McGraw* had not yet been published, and thus she could not have reviewed it or compared it to her case. Reply at *4. I concur, and will therefore not include it in my analysis herein.

*Ramos.*[13] Opp. at *9-10. Respondent argues that Petitioner's initial delay in reporting her pain, her primary treatment modality – chiropractic treatment provided by her husband – and lack of other extensive treatment all favor an award consistent with other "very mild" SIRVA cases. *Id.* at *10. And the cases Petitioner cites are "more severe than her very mild course of treatment," making them inapplicable. *Id.*

In reply, Petitioner emphasizes her MRI finding of a small tear and her lengthy SIRVA treatment of three years and ten months. Petitioner's Reply, filed March 7, 2024, at *2-3 (ECF No. 49) ("Reply). She also describes her injury as lasting 32 months and then plateauing and becoming permanent (Reply at *2) – although the record does not support a finding of a permanent injury. Responding to Respondent's argument concerning her delay in seeking care, she cites the many reasons why she did so, asserting that the delay in seeking care is not a sign of lack of pain. *Id.* at *3.

Petitioner also argues that *Ramos* is very different" from this case, in that the *Ramos* petitioner first sought treatment four months after vaccination and, after a few other appointments, did not seek care for his shoulder again for another six months. Reply at *4. By contrast, Ms. Brennan received "a substantial amount of treatment for her shoulder." *Id*

### B. Out of Pocket Expenses

Petitioner requests reimbursement for out of pocket expenses totaling $4,839.49.[14] Reply at *5. This total includes $4,000.00 for chiropractic care from Brennan Chiropractic, $50.00 paid to the orthopedist, $189.49 paid for her physical therapy evaluation, and $600.00 paid for her MRI. *Id.*

Respondent agrees that Petitioner's expenses for the orthopedist, physical therapy evaluation, and MRI should be reimbursed.[15] Opp. at *11; Reply at *5. But Respondent

---

[13] *McKenna v. Sec'y of Health & Human Servs.,* No. 21-0030V, 2023 WL 5045121 (Fed. Cl. Spec. Mstr. July 7, 2023); *McGraw v. Sec'y of Health & Human Servs.,* No. 21-72V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024); and *Ramos v. Sec'y of Health & Human Servs.,* No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021).

[14] In her damages brief, Petitioner requested $4,739.49 for out of pocket expenses. Br. at *18. However, in her reply, she explained that due to an inadvertent misstatement of the amount for the MRI, the total is actually $4,839.49. Reply at *5.

[15] In his damages brief, Respondent contested reimbursement for the MRI due to lack of proof of payment for the charge. Opp. at *11. This prompted Petitioner's counsel to investigate and discover that some records had been prepared for filing in March 2021, but had not actually been filed. Reply at *5. Petitioner represents that after Petitioner produced proof of payment for the MRI, Respondent agreed that this should be reimbursed. *Id.*

does not agree to reimbursement of the Brennan Chiropractic charges, on the basis that this amount "clearly includes items unrelated to petitioner's right shoulder, such as spinal manipulation, multiple ultrasounds, and records production." *Id.*

Petitioner replies that Brennan Chiropractic charges are reimbursable because they are for treatment of her SIRVA. Reply at *6-7. Dr. Brennan submitted a supplemental affidavit explaining the charges and that those listed as "extraspinal" are for chiropractic manipulation therapy for the shoulder, and those listed as "spinal" are treatments for "the areas of the neck and spine that were affected by (or related to) Petitioner's shoulder pain." *Id.* at *6. And the ultrasounds "were important in the treatment of Petitioner's shoulder injury" for the reasons Dr. Brennan explained in his supplemental affidavit. *Id.* Petitioner acknowledged that the charges for record production could be eliminated, and states that she has agreed to subtract "nutrient charges" for supplements. *Id.* at *7. She adds that these total only $150.57, and that because Dr. Brennan had already discounted his bill by $1,125.57, these charges had already effectively been removed from her request. *Id.*

### III.   Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section V.A-B of *Fritz v. Sec'y of Health & Human Servs.*, No. 21-2086V, 2024 WL 4349581, at *6-8 (Fed. Cl. Spec. Mstr. Aug. 29, 2024).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[16]

---

[16] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

### IV.  Appropriate Compensation

#### A. Pain and Suffering

Although I found that Dr. Brennan's records, along with other medical records, were sufficient to rule in Petitioner's favor on entitlement, in evaluating damages I cannot ignore that he is not *only* her health care provider. Dr. Brennan is *also* Petitioner's husband and employer. As such, his role was more complicated, and somewhat less objective, than a typical health care provider.[17]

I do not suggest that either Petitioner or Dr. Brennan has acted improperly or in any way lacking integrity. But these circumstances inherently raise questions about the provider's ability to be objective – and thus the extent to which his treater conclusions can be relied upon. *See, e.g.*, *Flynn v. Sec'y of Health & Human Servs*., No. 89-54V, 1990 WL 293364, at *6 (Fed. Cl. Spec. Mstr. May 17, 1990) ("written records contemporaneously created by "disinterested" persons should ordinarily be considered more reliable evidence than testimony of persons with a financial or other strong interest in the outcome of litigation"); *McDaniel v. Hartford Life and Accident Ins. Co.*, No. 5:07-cv-7, 2008 WL 4426087, at *7 (M.D. Ga. Sept. 25, 2008) (giving greater weight to objective physicians than personal treating physicians in part due to "a concern that the insured's personal physicians will be tempted, consciously or subconsciously, to skew their findings out of personal loyalty or concern for a regular patient").

These concerns are cast into high relief when a comparison is made to Petitioner's records from third-party treatment visits. Thus, when Petitioner saw Dr. Buss in July 2020, she reported no pain, and her right shoulder active ROM was only slightly worse than her left shoulder. Ex. 5 at 18, 19. At her physical therapy evaluation the following week, her ROM had worsened and she had positive impingement tests. *Id.* at 4, 5. As she treated with Dr. Brennan over the following months, her pain decreased and her ROM improved.

Overall, the record best supports a finding that Petitioner's injury was on the milder side for a SIRVA and had mostly improved, with lingering symptoms, by the end of 2020, even though treatment continued thereafter.[18] At that point, the records show that she

---

[17] Even the lack of an arms-length nature of their professional treatment relationship is problematic to some degree. Petitioner treated with her husband over a period of nearly four years, from February 11, 2020 to December 5, 2023. Ex. 18 at 2-9. But the payment records indicate that she did not make any payments until the final treatment date, December 5, 2023. Id. at 11. At that time, Petitioner paid the entire bill from a joint account of "J and F Brennan" – presumably John (Dr. Brennan) and Fayth (Petitioner) Brennan. Id. Thus, it appears that Dr. Brennan's fees were paid from his own checking account.

[18] That same record suggests Petitioner's injury was mostly resolved by the fall of 2020. On September 8, 2020, she reported a pain level of zero out of ten, and a decrease in the frequency of her pain frequency. Ex. 3 Vol. II (ECF No. 48-2) at 19. In October 2020, she had "plateaued." *Id.* at 18. And on November 3,

12

continued to complain of only occasional and brief – though intense – spikes of pain that were associated with certain motions, especially at end ranges. Although she continued to treat for another three years, she treated solely with Dr. Brennan, and those records document minimal and improving symptoms.

During 2020, Petitioner consulted with an orthopedist once, underwent an MRI and physical therapy evaluation, and attended 23 chiropractic appointments, at many of which she was treated not only for her shoulder and but also her neck and back. Although Dr. Brennan states that her neck and back were affected by her shoulder injury and thus reflect vaccine injury-related sequelae, this contention is not supported by the record. In fact, Petitioner saw Dr. Brennan for neck and back problems *prior* to her vaccine-related shoulder injury, at least as far back as 2017. Ex. 3 at 3-5.

Thus, Petitioner's injury was on the milder side, and persisted for about a year, with relatively minimal treatment. Throughout treatment, Petitioner had little or no pain at rest, but relatively severe pain with certain movements which quickly abated. As such, although Petitioner's activities were restricted, she was not in constant pain, as is true in some SIRVA cases. The injury also did not involve surgery, or any more intrusive form of treatment of the sort that would counsel in favor of a higher award.

The cases Petitioner cites all involve more severe injuries, with *Gibson* and *Mantagas* also involving injuries of greater duration. *Ramos,* by contrast, is a good comparable. *Ramos* and the present matter involve petitioners with injuries of similar duration, about a year. Both significantly delayed seeking care, with Petitioner first treating 96 days after vaccination compared to 121 days for the *Ramos* petitioner. Neither petitioner had a cortisone injection, and the *Ramos* petitioner attended more physical therapy and had greater ROM restrictions and greater pain at rest, while Petitioner also treated with chiropractic care. *Ramos*, 2021 WL 688576, at *2. I find that the same award is appropriate in this case, and therefore Petitioner shall receive **$40,000.00.**

### B. Out of Pocket Expenses

I have found that Petitioner's SIRVA related treatment continued through the end of 2020. In the section above, I also noted that the record does not support a finding that her treatment for her neck and back complaints were related to her SIRVA, and thus they are not reimbursable. I therefore find that $1,525.00 of the amount requested for Brennan

---

2020, she was reporting three to five seconds of intense pain when pain was elicited. *Id.* At most, she continued to have mild and intermittent symptoms until December 2020.

Chiropractic is reimbursable.[19] This is in addition to the sums agreed to by the parties ($50.00 paid to the orthopedist, $189.49 paid for her physical therapy evaluation, and $600.00 paid for her MRI). Thus, Petitioner is entitled to a total of **$2,364.49** for out-of-pocket expenses.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $40,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[20] Additionally, I find that Petitioner is entitled to **$2,364.49 in out of pocket expenses.**

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $42,364.49, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[21]

**IT IS SO ORDERED.**

          **s/Brian H. Corcoran**
          Brian H. Corcoran
          Chief Special Master

---

[19] This sum includes all treatment in 2020 from Brennan Chiropractic except for charges for her neck and back treatment (those coded as CMT-spinal) and the charges Petitioner agreed to subtract (nutrient charges and records fees).

[20] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[21] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.